# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| R.S., <br> *a minor, by her parents and next friends,* <br> *B.S. and T.S., et al.,* | * <br> * <br> * |
| Plaintiffs, | * |
| v. | *      Civil No. 23-0838-BAH |
| MONIFA B. MCKNIGHT, <br> *officially as Superintendent of* <br> *Montgomery County Public Schools, et al.,* | * <br> * <br> * |
| Defendants. | * |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

## MEMORANDUM OPINION

Plaintiffs R.S., a minor student, and her parents, T.S., and B.S., both on their own behalf and on behalf of their daughter (collectively "Plaintiffs"), brought suit against Monifa B. McKnight, superintendent of Montgomery County Public Schools, in her official capacity, as well as the Montgomery County Board of Education (collectively "Defendants") alleging violations of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. (the "IDEA"). ECF 1. Pending before the Court are Plaintiffs' motion for summary judgment, construed as a motion for judgment on the record,[1] ECF 19, and Defendants' cross motion for judgment on the record, ECF 20. Plaintiffs filed an opposition to Defendants' motion and reply in support of their own motion.

---

[1] Plaintiffs assert in their own motion for summary judgment that "[i]f neither party introduces additional evidence, a motion for summary judgment acts as a motion for judgment based on the evidence in the record." ECF 19-1, at 13 (citing *Brown ex rel. E.M. v. District of Columbia*, 568 F. Supp. 2d 44, 50 (D.D.C. 2008)). As there has been no additional evidence introduced in this case beyond the administrative record, the Court construes Plaintiffs' motion for summary judgment as a motion for judgment on the record.

ECF 21. All filings include memoranda of law and exhibits.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Plaintiffs' motion for judgment on the record, ECF 19, is **DENIED**, and Defendants' motion for judgment on the record, ECF 20, is **GRANTED**.

## I.   BACKGROUND

Some background on the IDEA is necessary to contextualize this case. The IDEA was enacted to "ensure that all children with disabilities have available to them a free appropriate public education," to protect the rights of such children and their parents, and to facilitate the provision of services to those children. 20 U.S.C. § 1400(d). A "free appropriate public education" ("FAPE") is an education comprised of "special education and related services" that is "provided at public expense . . . without charge," meets state educational standards, includes state public elementary and secondary schools, and is "provided in conformity with the [student's] individualized education program [(an 'IEP')]." § 1400(9). An IEP is an educational plan specifically designed for a student's individual needs based on their disability, their academic progress, and their goals, that outlines the specific services and aids a student will receive in order to reach their goals. § 1414(A). In essence, the IDEA requires that public school systems provide the accommodations a child with a disability requires in order for them to receive an "appropriate" education at no cost, and the school systems do this through utilizing an IEP. *See Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390–91 (2017) (explaining the purpose and requirements of the IDEA).

"The IDEA requires that a child's parents be included in the IEP decisionmaking process as members of the IEP team." *R.F. ex rel. E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 241 (4th

---

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

Cir. 2019) (citing 20 U.S.C. § 1414(d)(1)(B)).  When parents are dissatisfied with their child's IEP and unable to resolve their concerns with the school-based members of the IEP team directly, the parents can request "a 'due process hearing' before a state or local educational agency." *Endrew F.*, 580 U.S. at 391–92 (citing §§ 1415(f)(1)(A), (g)).  "And at the conclusion of the administrative process, the losing party may seek redress in state or federal court." *Id.* (citing § 1415(i)(2)(A)).  It is this process that brings the parties before the Court today. [3]

R.S. is a minor student who has been diagnosed with dyslexia, attention-deficit/hyperactivity disorder (ADHD), and anxiety disorder. *See R.S. v. Montgomery Cnty. Pub. Schs.*, OAH No. MSDE-MONT-OT-22-15852, at 5 ¶ 2 (Md. Off. Admin. Hr'gs Nov. 30, 2022) ("Decision").[4]  R.S. began attending Montgomery County Public Schools ("MCPS"), her local school system, in kindergarten. *Id.* ¶ 3.  In June 2016, MCPS determined identified R.S. as a student eligible for special education services and developed, in collaboration with R.S.'s parents, the first IEP for R.S. for her third-grade year. *Id.* ¶¶ 4–6.  In 2018, at the end of R.S.'s fourth-grade year, her parents hired Mr. Richard Weinfeld, an educational consultant, to advise on her education and academic progress. Transcript, at 45:16–22.

In May 2019, as R.S. completed fifth grade at MCPS, the school-based members of R.S.'s IEP team and her parents again collaborated to develop an IEP for R.S.'s sixth-grade year. Decision, at 5–8 ¶¶ 8–19.  R.S. had done well in fifth grade, and she was reading at a "mid-fifth

---

[3] As explained below, the administrative law judge's factual findings are entitled to deference, and, as such, the facts of this case are pulled from the administrative decision.  The facts of this case are laid out in much more detail in the administrative decision. *See R.S. v. Montgomery Cnty. Pub. Schs*, OAH No. MSDE-MONT-OT-22-15852 (Md. Off. Admin. Hr'gs Nov. 30, 2022) ("Decision").

[4] Citations to the transcript of the hearing in *R.S. v. Montgomery Cnty. Pub. Schs.*, OAH No. MSDE-MONT-OT-22-15852 (Md. Off. Admin. Hr'gs Nov. 30, 2022) will be indicated as "Transcript."

grade level" at the end of the school year. *Id.* at 5 ¶ 7. The IEP team, including both R.S.'s parents and the school-based members of the team, evaluated R.S.'s academic strengths and weaknesses, her fifth-grade performance, and external evaluations, to aid in developing the IEP for R.S. for the following year. *Id.* at 6 ¶¶ 10–12. The IEP for R.S.'s sixth-grade year, 2019–2020, called for R.S. to receive "3 hours and 45 minutes per day inside the general education setting and 45 minutes per day outside the general education setting. . . . in a self-contained resource class." *Id.* at 7 ¶ 14. R.S. would receive services in her math, science, English classes in the form of co-teaching or "supported instruction." *Id.* ¶ 16. She would also receive reading intervention programming on a daily basis, also with a co-teacher or "supported instruction." *Id.* The IEP further "contained numerous testing and instructional accommodations" for R.S.'s sixth-grade year. *Id.* ¶ 17. R.S. "would also participate with non-disabled peers in non-academic and extracurricular activities." *Id.* ¶ 15. The IEP included specific academic goals for R.S. for the coming year. *Id.* at 7–8 ¶ 18.

R.S. began sixth grade receiving all of the services outlined in her IEP through MCPS's "Learning and Academic Disabilities" ("LAD") program.[5] Decision, at 8 ¶¶ 20–21. R.S.'s academic classes included Academic Literacy, Grade 6 Advanced English in the school's "gifted

---

[5] According to MCPS's website:

> LAD services are delivered primarily in the general education setting where students receive specially designed instruction with their nondisabled peers. Access to academic and behavioral interventions are provided in the least restrictive environment inside and outside of the general education classroom based on the individual needs of each student. Specially designed instruction is delivered by the general education teachers in collaboration with special education teachers and paraeducators through the implementation of co-teaching and supported service delivery models.

*Special Education—School Age: Elementary and Secondary Services*, Montgomery Cnty. Pub. Schs., https://www.montgomeryschoolsmd.org/departments/special-education/programs-services/age-elementary-to-secondary/ (last visited Jul. 12, 2024) [https://perma.cc/K4AQ-R7QR].

and talented" ("G&T") program, "Historical Inquiry into Global Humanities" through the school's G&T program, "Mathematics 6," and "Investigations in Science 6." *Id.* ¶ 21. During the first three quarters of the 2019–2020 school year, R.S. participated "consistently" or "often" in all of her academic classes. *Id.* at 13 ¶¶ 48–50. She "consistently completed her assignments in each class." *Id.* ¶ 47. She earned exclusively As and Bs in all of her classes except for Advanced English. *Id.* at 12–13 ¶¶ 44–45. In Advanced English, she earned Cs for the first and second quarters of the year, but "brought her grade up to a B" in the third quarter. *Id.* at 13 ¶ 45. R.S.'s progress reports indicated that she was "making sufficient progress" to meet her educational goals. *Id.* at 19–20 ¶ 65. Her teachers noted that R.S. had "mainly positive relationships with teachers; seemed confident with both peers and teachers; took a 'helping role' with peers; eagerly participated in class; and worked collaboratively with multiple peers." *Id.* at 12 ¶ 38. Her teachers also observed her interacting with students who appeared to be her friends.[6] *Id.*

In the fourth quarter of the 2019–2020 school year, the Covid-19 pandemic wrought havoc upon schools across the country, and MCPS transitioned to remote learning. Decision, at 9–10 ¶ 28. MCPS attempted to continue to accommodate R.S.'s IEP through distance learning with the implementation of a "distance learning plan" ("DLP") which included "supplementary aids, services and supports, and accommodations." *Id.* at 10 ¶¶ 29–30. MCPS switched to a "pass/fail" grading system for the fourth quarter of the 2019–2020 school year "[a]s a result of the unexpected pivot to distance learning." *Id.* at 12 ¶ 44. Though R.S. earned passing grades for the fourth quarter, the IEP team later determined that she was performing below grade level expectations on

---

[6] Despite these overall positive observations of R.S.'s social relationships with her peers, R.S. reported three instances of bullying during sixth grade, each involving boys being rude to her or teasing her. *See* Decision, at 8–9, ¶¶ 22–25. These instances bear no facial relationship to any of R.S.'s disabilities. *See id.* R.S.'s parents filed complaints relating to each of the incident and "worked closely" with school staff to address the incidents. *Id.* at 9 ¶ 26.

several reading- and writing-related skills as well as "social interaction skills" and "attention/executive functioning" at the end of the 2019–2020 school year. *Id.* at 22–23 ¶¶ 74–80.

R.S.'s parents, concerned about her academic performance, had a private psychological assessment conducted of R.S. by Dr. Aparna Rao, Psy.D, in May 2020. Decision, at 13 ¶ 51. Dr. Rao authored two versions of a report on R.S. *See id.* at 18–19 ¶¶ 57–60. Both versions of Dr. Rao's report found, among other things, that R.S.'s reading skills had declined since her last formal evaluation in 2017 and that R.S. had difficulty with distractibility and inattention. *Id.* at 15 ¶ 53. Both versions of the report also recommended numerous specific accommodations that would benefit R.S., including extended time on tests, use of assistive technology, intensive reading instruction, and many others. *Id.* at 16–17 ¶ 56. The first version of Dr. Rao's report called for R.S. to be placed in a "LAD program or a school specifically designed to teach students with learning disabilities, with small group instruction for reading." *Id.* at 18 ¶ 57. The first report further suggested that R.S. could be accommodated by taking "co-taught classes for content area subjects" so long as she received accommodations and "direct special educator support on a daily basis." *Id.* Dr. Rao adjusted the report, however, based upon feedback from R.S.'s parents and Mr. Weinfeld that they "hoped [Dr. Rao] would consider recommending small supportive classes throughout the day." *Id.* The second version of the report called for "[s]mall classes with a low student-to-teacher ratio for all subjects." *Id.* at 16 ¶ 56.

After the completion of R.S.'s sixth grade year, her parents enrolled her at the McLean School ("McLean") for seventh grade, signing an enrollment contract with McLean in June 2020. Decision, at 19 ¶ 62. McLean is a private school in Montgomery County that operates on "a college preparatory model, which places an emphasis on small classes and 'differentiated instruction.'" *Id.* at 19 ¶ 62, 27 ¶ 94.

In July 2020, R.S.'s IEP team—including her parents, the school-based team, and Mr. Weinfeld—convened to develop an IEP for R.S.'s seventh-grade year, 2020–2021. Decision, at 19 ¶ 63. The team reviewed R.S.'s performance over the last year, evaluations from her teachers, Dr. Rao's report, and input rom her teachers, among other things. *Id.* ¶ 64. In response to this information, the IEP the team prepared for R.S.'s seventh-grade year included dozens of forms of support for R.S., such as assistive technology, "[o]pportunities to deconstruct social situations with a trusted adult," and many specific forms of instructional support. *Id.* at 23–25, ¶¶ 82–86. The new services added to R.S.'s seventh-grade IEP "incorporated the vast majority of Dr. Rao's recommendations" for supports. *Id.* at 18 ¶ 59. The seventh grade IEP provided that R.S. "would receive instruction in the general education setting for math, reading intervention,[7] English, social studies, and science classes" as well as "participate in electives and lunch with her non-disabled peers." *Id.* at 26 ¶ 89. R.S. would also "receive specialized instructions in a self-contained resource class." *Id.*

R.S.'s parents rejected MCPS's proposed IEP, believing that it would not provide R.S. with a FAPE. Decision, at 27 ¶ 91. They asked MCPS to instead "place and fund" R.S. at McLean for the 2020–2021 school year. *Id.* MCPS declined. *Id.* ¶ 92. R.S. attended McLean for seventh grade in 2020–2021. *Id.* ¶ 93. At McLean, R.S. made honor roll during the first quarter of her seventh-grade school year. *Id.* ¶ 95. She progressed toward her academic goals, but she still struggled with several skills related to reading and executive functioning, and many of her skills related to reading, writing, and executive functioning, as well as her "social interaction skills,"

---

[7] "Reading intervention . . . is taught by a general education teacher in a class of approximately twelve or fewer students. It is not a special education service." Decision, at 26 ¶ 90.

were still below average. *Id.* at 28 ¶¶ 98–100, 36–37 ¶¶ 117–125. R.S.'s grades "ranged from A to B, with the occasional B- or C" during seventh grade. *Id.* at 34 ¶ 110.

In August 2021, R.S.'s parents again asked MCPS to place and fund R.S. at McLean, where they had already enrolled her for eighth grade, for the upcoming 2021–2022 school year. Decision, at 28 ¶ 101. After several months of back-and-forth regarding scheduling and obtaining information relating to R.S.'s progress during her seventh-grade year, the IEP team—again comprised of MCPS staff, R.S.'s parents, and Mr. Weinfeld—met to develop an IEP for R.S.'s eighth grade year at MCPS. *See id.* at 28–29 ¶ 102–03, 34–35 ¶¶ 112–115. The IEP team reviewed all available data of R.S.'s progress for the past year, including reports from R.S.'s teachers at McLean, reports from R.S.'s parents, observations from Mr. Weinfeld, and R.S.'s grades at McLean. *Id.* at 35 ¶ 115. The IEP team revised R.S.'s proposed IEP for eighth grade, including adding "frequent check-ins," "ESY services,"[8] "a reading intervention for 45 minutes per day" comprised of "small group instruction using systematic intervention," and "a resource class for 45 minutes daily, outside general education." *Id.* at 35–36 ¶ 116, 37 ¶ 126. R.S. remained at McLean for her eighth-grade year. *Id.* at 28 ¶ 101.

At the end of eighth grade at McLean, R.S. was still below grade level on several reading- and writing-related skills as well as "attention/executive functioning." Decision, at 43–44 ¶¶ 151–159. R.S. underwent two psychological evaluations during her eighth-grade year to aid in the development of her IEP for ninth grade with MCPS staff: one with Dr. Barbara Butera and one with Dr. Brenda Browne. *Id.* at 39–40 ¶¶ 136–147. Dr. Butera opined that "[b]ased upon her

---

[8] "ESY" services are "extended school year" services. *Special Education: Extended School Year Services*, Montgomery Cnty. Pub. Schs., https://www.montgomeryschoolsmd.org/departments/special-education/programs-services/esy/ (last visited Jul. 17, 2024) [https://perma.cc/7BUM-22WK].

review of the past assessments and her own evaluation of [R.S.] . . . [R.S.] was not actively reporting symptoms of anxiety . . . and that the current teacher and parent ratings did not result in clinically significant levels of anxiety on the rating scales." *Id.* at 40 ¶ 139. Dr. Browne's evaluation reported that R.S. had strong social skills, math skills, and specific, simple reading skills, such as "[h]igh frequency words," and "[w]riting at the single sentence level." *Id.* a 42 ¶ 146. She also found that R.S. was weak in reading phonics, reading fluency, reading comprehension, written language expression, and attention. *Id.* Dr. Browne recommended several accommodations to address R.S.'s needs, such as use of a graphic organizer, "[o]ngoing multisensory instruction," and "[u]se of text to speech to support reading comprehension." *Id.* ¶ 147. In August 2022, the IEP team developed a proposed IEP for R.S.'s ninth-grade year, incorporating many of the recommendations from Dr. Browne. *Id.* at 44 ¶¶ 160–61.

R.S. attended McLean for ninth grade. Decision, at 46 ¶ 166. R.S.'s parents rejected the proposed IEP for the 2022–2023 school year and requested a due process hearing before an administrative law judge ("ALJ") with the Maryland Office of Administrative Hearings. *Id.* at 1. The due process hearing was held from October 12–31, 2022, before an ALJ. *Id.* at 2. After considering 120 exhibits and six days of testimony, the ALJ issued her decision. *See id.* at 1–2, Appendix to Decision, at 1–4. The ALJ found that Defendants had offered R.S. a FAPE for the 2020–2021, 2021–2022, and 2022–2023 school years. Decision, at 46.

Plaintiffs filed this lawsuit asking that the Court find that Defendants violated Plaintiffs' rights under the IDEA, vacate the ALJ's decision below, order that Defendants reimburse Plaintiffs for R.S.'s tuition and enrollment expenses at McLean for the 2020–2021, 2021–2022, and 2022–2023 school years, and order Defendants to place R.S. at McLean for the upcoming 2024–2025 school year. ECF 1, at 19–20.

## II.   **LEGAL STANDARD**

When faced with a motion for judgment on the administrative record in IDEA cases, this Court conducts "a modified de novo review, 'giving "due weight" to the underlying administrative proceedings.'" *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523 (4th Cir. 2002) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). The "due weight" standard means that "when an ALJ makes findings of fact 'in a regular manner and with evidentiary support,' those findings 'are entitled to be considered *prima facie* correct,' and 'the district court, if it is not going to follow them, is required to explain why it does not." *A.H. v. Smith*, 367 F. Supp. 3d 387, 411 (D. Md. 2019) (quoting *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991)). "If the reviewing court finds that the administrative authority has departed 'far from the accepted fact-finding process,' the fact-finding is not 'regularly made.'" *S.S. v. Bd. of Educ. of Harford Cnty.*, 498 F. Supp. 3d 761, 775 (D. Md. 2020) (quoting *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011)).

But this deference has its limits. "[E]ven if the factual findings are found to be 'regularly made,' the district court must still make its own independent determination regarding the legal conclusions that have been drawn by the administrative officer." *S.S.*, 498 F. Supp. 3d at 775 (citing *Heffernan*, 642 F.3d at 485). "The Court then reaches its decision based on the preponderance of the evidence." *A.H.*, 367 F. Supp. 3d at 411 (citing *Rowley*, 458 U.S. at 205). And the Court may still choose not to defer to "regularly made" factual findings so long as it explains its reasoning. *Id.* at 412. Nevertheless, "[i]n making this independent decision, courts should not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *R.F.*, 919 F.3d at 245 (quoting *Rowley*, 458 U.S. at 206).

## III.  ANALYSIS

Plaintiffs claim that they are entitled to judgment because Defendants failed to offer R.S. a FAPE for the 2020–2021, 2021–2022, and 2022–2023 school years. ECF 19-1, at 1. Plaintiffs claim that the ALJ's decision below was fundamentally flawed and should be overturned, and request that the Court order Defendants to reimburse Plaintiffs for R.S.'s tuition at McLean. *Id.* at 1–2. Defendants, in turn, claim that they are entitled to judgment because Defendants offered R.S. a FAPE for each of the years in question and the ALJ was correct to determine as much. ECF 20-2, at 50.

### A.  The ALJ's decision is entitled to due weight.

Plaintiffs claim that the ALJ's decision is "significantly flawed" because it (1) does not answer the "fundamental question" of whether Defendants offered R.S. a FAPE, instead answering only "an incorrect question, whether R.S. required placement in a small classroom setting throughout the day," (2) "failed to acknowledge the differences in special education services proposed for different school years," (3) failed to appropriately consider R.S.'s responses to the programming she received; and (4) "completely overlooked the school system's obligation to provide a cogent and responsive explanation for R.S.'s proposed programming." ECF 19-1, at 1–2. The Court addresses each of these arguments in turn.

#### 1.  *The ALJ determined that Defendants had offered R.S. a FAPE for each of the school years in question.*

Plaintiffs argue that the ALJ failed to rule on the primary question before her, whether Defendants had offered R.S. a FAPE for each of the school years in question. ECF 19-1, at 15–18. A brief skim of the ALJ's decision, however, demonstrates that she stated explicitly that

11

Defendants had offered R.S. a FAPE for the relevant school years no fewer than seven times.[9] Decision, at 46 ("MCPS offered the Student a FAPE for the 2020–2021, 2021–2022, and 2022–2023 school years, with an IEP that was reasonably calculated to meet her unique needs"); *id.* at 58 ("The IEP is reasonably calculated to provide the Student with a FAPE for the 2020–2021, 2021–2022, and 2022–2023 school years"); *id.* ("I conclude that MCPS developed an IEP that was reasonably calculated to meet the unique needs of the Student for the 2020–2021, 2021–2022, and 2022–2023 school years."); *id.* at 59 ("The evidence supports the fact that . . . the [2020–2021] IEP is reasonably calculated to meet the Student's unique individualized needs."); *id.* at 63 ("Based on the foregoing, I find that the IEP developed for the 2020–2021 school year was reasonably calculated to provide the Student a FAPE in the least restrictive environment."); *id.* ("I find that MCPS also developed IEPs for the 2021–2022 and 2022–2023 school year[s] that were reasonably calculated to provide the Student FAPE and meet her unique needs."); *id.* at 65 ("I conclude as a matter of law that the MCPS made a free appropriate public education available to the Student and provided her with an appropriate individuated education program and placement for the 2021–2022, and 2022–2023 school years."). It is difficult to imagine how the ALJ could have made her findings on this point more explicit.

---

[9] Plaintiffs also assert in a footnote that the ALJ failed to rule on any of the nine issues she recognized at the outset of the decision. ECF 19-1, at 15 (citing Decision, at 3–4). Three of those issues were whether Defendants made a FAPE available to R.S. during each relevant school year, and the remaining six issues were conditional upon the outcome of the inquiry as to whether Defendants offered a FAPE to R.S. for each relevant school year. *See* Decision, at 3–4. The conditional questions were only required to be answered if the ALJ found that a FAPE was not offered. *Id.* The ALJ clearly explained that her finding that a FAPE was offered for each relevant year renders the rest of the issues moot. *Id.* at 65 ("I have concluded in this case . . . that the IEP and placement offered by the MCPS would have provided Student with a FAPE. Therefore, . . . the issues of whether the Student's placement at [] McLean is proper is not required to be addressed further in this decision.").

Plaintiffs further argue that "[t]he ALJ completely misunderstood the issue before her as it relates to the appropriateness of the proposed MCPS IEPs, instead assessing whether the parents demonstrated that R.S. required placement in a small classroom setting throughout the entire day." ECF 19-1, at 15.  The Court disagrees.  Parents who challenge the sufficiency of an IEP in a due process hearing before an administrative officer "bear the burden of showing why it is deficient." *Weast v. Schaffer ex rel. Schaffer*, 377 F.3d 449, 456 (4th Cir. 2004), *aff'd*, 546 U.S. 49 (2005). Thus, though it was Defendants' duty to provide R.S. with a FAPE and develop an IEP to do so, it was Plaintiffs' burden at the due process hearing to show that Defendants had failed in that duty.

Nor can the ALJ be faulted for devoting some portion of her analysis to explicitly addressing Plaintiffs' failure to "offer sufficient evidence to establish that [R.S.] is unable to make progress and access learning outside of a small classroom environment." Decision, at 61.  The ALJ made clear that she addressed this issue not based upon her own whims, but rather because the question of a small classroom setting was the primary complaint Plaintiffs raised regarding the IEPs designed for R.S.  *Id.* at 60 ("Most significantly, the Parents disagreed with the Student's proposed placement because they felt that the Student's needs would best be met in a small classroom setting for academics[.]").  Indeed, the record is replete with Plaintiffs offering exactly this criticism of the IEP, including their filings in this very lawsuit.  *See e.g.*, Transcript, at 212:6– 9 ("I'm concerned in general about class size for her . . . .); ECF19-1, at 27–28 (describing R.S.'s preference for the smaller class sizes offered at McLean).  Addressing Plaintiffs' primary argument was part of the duty of the ALJ, and she was correct to place the burden for showing the inadequacy of the IEP on Plaintiffs.  *See Schaffer*, 377 F.3d at 456.  Contrary to Plaintiffs' contentions, the ALJ appropriately understood and addressed "the issue before her as it relate[d] to the appropriateness of the proposed [] IEPs." ECF 19-1, at 15.

13

2.   *The ALJ appropriately considered the differences in the proposed IEPs for different school years.*

Plaintiffs argue that the ALJ erred in failing to acknowledge the differences between the proposed IEP for the 2022–2023 school year and the proposed IEPs for the 2020–2021 and 2021–2022 school years, specifically the increase in "self-contained special education services" in the 2022–2023 school year. ECF 19-1, at 17. Implicit in this argument is an assertion that an increase in self-contained special education services for R.S.'s ninth grade year in 2022–2023 suggests that the 2021—2022 and 2020–2021 IEPs were inadequate because they lacked those services. *See id.* ("Yet, in the analysis of her Decision, the ALJ did not even acknowledge that there was a difference in proposed services and considered the appropriateness for both IEPs together, nor did she attempt to explain how both IEPs were appropriate despite the difference in proposed services.").

Plaintiffs are correct that the ALJ grouped the 2021–2022 and 2022–2023 school years together in her analysis, and they are also correct that the ALJ did not explicitly mention the difference in the amount of self-contained special education services in that section of analysis. *See* Decision, at 63–65. But an IEP for one school year "cannot be used to discredit [an] earlier IEP" that had different services merely because the IEP team saw fit to include different or additional services in later years. *T.S. v. Weast*, Civ. No. DKC-09-1581, 2010 WL 2431021, at *12 (D. Md. June 10, 2010); *see also Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir. 2009) ("[I]f services added to a later IEP were always used to cast doubt on an earlier one, school districts would develop a strong disincentive against updating their IEPs based on new information."). Thus, the ALJ did not err in failing to compare the IEPs in this way.

And though the administrative decision did not compare the self-contained special education services between the IEPs as a test for sufficiency between the two, the ALJ did

14

acknowledge differences between the 2021–2022 IEP and the earlier IEPs. Specifically, the ALJ noted:

> During the hearing, counsel for the Parents quipped that the Student's IEPs became longer and longer as the years went by. He is correct, and the lengthening of the IEP reflects the addition of new goals, supplemental supports and services, and present levels, when appropriate.

Decision, at 64. Thus, the ALJ found that the differences between the IEPs reflected only that Defendants' proposed IEPs were developing to suit R.S.'s needs.

Furthermore, in considering the 2021–2022 and 2022–2023 IEPs, the ALJ made clear that she evaluated both IEPs independently, though she grouped her analyses of the IEPs for the two school years together. *See* Decision, at 64 ("The IEPs for both the 2021–2022 and the 2022–2023 school years again give a detailed account . . . . Each IEP also documented the Student's present levels of academic achievement or functional performance in each of the areas which were identified as having been affected by her disability."). The decision also references the ALJ's findings of fact, which describe in detail the process by which the IEPs were developed. *See, e.g.*, Decision, at 64 ("*As described in the Findings of Fact*, the IEP team also developed annual goals and objectives for the Student that continued to directly address the Student's deficits . . . ." (emphasis added)). Thus, the ALJ did not err in failing to consider differences between the IEPs.

### 3. *The ALJ appropriately considered R.S.'s responses to programming at both MCPS and McLean.*

Plaintiffs next assert that the administrative decision is flawed because "[t]he ALJ failed to consider R.S.'s response to programming, both in MCPS and at McLean." ECF 19-1, at 18. Plaintiffs are correct that "actual educational progress" is a key indicator of whether a child was truly offered a FAPE, and that both ALJs and district courts must "accord weight" to such evidence. *M.M.*, 303 F.3d at 532. But Plaintiffs' contention that the ALJ in this case ignored the evidence of R.S.'s progress is without support.

Though Plaintiffs undoubtedly disagree with the ALJ's assessment of the evidence, the decision carefully considers vast amounts of evidence, including R.S.'s performance at each of the schools she attended. The ALJ's Findings of Fact span forty-one pages and amply discuss R.S.'s performance at both MCPS and McLean. *See* Decision, at 5–46; *id.* at 5–6 (describing R.S.'s fifth grade performance, including that she was reading at a "mid-fifth grade level" by the end of the year and that "her attention had improved significantly during the school year and was no longer having an impact on her class participation and task completion"); *id.* at 11–12 (describing R.S.'s performance in sixth grade, including that her "sixth grade teachers never observed or reported any concerns about anxiety or adjustment," that "her attention was managed and . . . she successfully maintained attention" with the assistance of "supplementary aides," that that she "was earning all As and Bs, showing an understanding of the curriculum, and making academic progress" as of May 12, 2020, that she "brought her grade up to a B" in her English class in the third quarter, and that she passed all of her classes at the end of the year when the school switched to remote learning and pass/fail grading due to the pandemic); *id.* at 15–16 (describing Dr. Rao's evaluation of R.S. in 2020 during her sixth-grade year which showed that R.S.'s reading level and related skills had deteriorated since her previous evaluation); *id.* at 19–20 (describing IEP progress reports from April and June 2020 which stated that R.S. was "making sufficient progress to meet her goals"); *id.* at 22–23 (explaining that IEP team determined that R.S. was performing below grade level for many skills at the end of sixth grade); *id.* at 27–28 (describing R.S.'s performance at McLean during seventh grade, including that R.S. made honor roll for the first quarter of the school year and noting specific strengths and challenges demonstrated that year); *id.* at 28–34 (describing R.S.'s eighth grade performance at McLean, including a full recitation of teacher-generated progress reports noting strengths and areas for

improvement, and that R.S.'s "grades for the 2021–2022 school year generally ranged from A to B, with the occasional B- or C"); *id.* at 36 (describing R.S.'s skill levels at the end of eighth grade, many of which were found to be below grade level).

The decision does not merely acknowledge evidence of R.S.'s performance at both MCPS and McLean over a three-year period; the ALJ also carefully weighed this evidence in her consideration of whether Defendants offered R.S. a FAPE in each of the relevant school years. Decision, at 58–63. The decision acknowledged the worsening of R.S.'s academic performance over the course of her sixth-grade year. *Id.* at 61–62. The ALJ carefully evaluated Dr. Rao's report and ultimately determined that it should be given less weight than the other evidence presented, as there was significant evidence to suggest that Dr. Rao's recommendations were "changed to support the Parents' position that [R.S.] could only achieve educational benefit in a school setting such as McLean." *Id.* at 62.

The ALJ also considered R.S.'s performance in her sixth-grade year in the context of the worldwide chaos caused by the Covid-19 pandemic that broke out in March of the 2019–2020 school year. The ALJ came to the completely rational conclusion that switching to remote instruction, coupled with the trauma of the pandemic, were not ideal learning conditions for R.S., despite the efforts Defendants made to accommodate her. *See id.* at 62–63. The ALJ found that R.S.'s progress reports immediately before the pandemic outbreak, which showed "sufficient progress to meet her goals" were more representative of R.S.'s performance under the 2019–2020 IEP than her performance at the end of the year. *Id.* at 63. Thus, the ALJ appropriately considered the evidence presented relating to R.S.'s performance at MCPS during her sixth-grade year.

The ALJ also appropriately considered the evidence of R.S.'s performance at McLean, contrary to Plaintiffs' assertions. *See* ECF 19-1, at 26–28. In considering Plaintiffs' concerns

about the absence of a small class size requirement in the IEPs, the ALJ acknowledged that R.S. "appears to be doing well at McLean where there are small class sizes" but noted that "this is not evidence that small classes are *necessary* for her to make academic progress." Decision, at 61 (emphasis in original). The decision harkens back to this finding in the analysis of the 2021–2022 and 2022–2023 school years, explaining that "[f]or the reasons previously stated, . . . the parents have failed to establish that small classes . . . are required in order for the Student to make academic progress[.]" *Id.* at 65. While this analysis comes in the context of the debate over a class size requirement, it indicates that the ALJ was aware of the evidence from R.S.'s years at McLean and weighed that evidence in her overall analysis of whether Defendants offered R.S. a FAPE. *See S.A. v. Weast,* 898 F. Supp. 2d 869, 878 (D. Md. 2012)[10] (explaining that, by not addressing a piece of evidence, "the ALJ made an implicit credibility determination that is entitled to deference by the Court"); *see also A.H.,* 367 F. Supp. 3d at 412 ("[W]hile the district court must 'explain its reasons for rejecting the findings of the hearing officer,' the 'IDEA hearing officer is

---

[10] Plaintiffs suggest in their reply that *S.A. v. Weast*'s explanation of the deference due to an ALJ in an IDEA case is no longer good law after *Endrew F.* ECF 21, at 8 (citing *S.A. v. Weast,* 898 F. Supp. 2d 869 (D. Md. 2012) and *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1,* 580 U.S. 386 (2017)). This is incorrect. As explained by the District Court for the Southern District of New York:

> To the extent Plaintiffs imply that *Endrew F.,* 137 S. Ct. 988, somehow raised the standard of review applied to [administrative] decisions, the Court disagrees . . . . In fact, when [*Endrew F.*] is read in its entirety, it is clear that the Supreme Court is merely restating that federal courts should generally defer to the expertise of school authorities. . . . The Supreme Court was not rolling back its call for deference to school authorities.

*M.R. ex rel. A.R. v. Katonah Lewisboro Union Free Sch. Dist.,* Civ. No. 18-9938, 2019 WL 6251196, at *14 n.9 (S.D.N.Y. Nov. 21, 2019). Additionally, this Court has continued to rely on *S.A.*'s reasoning with respect to the deference due to an ALJ decision since the issuance of *Endrew F. See, e.g., A.H.,* 367 F. Supp. 3d at 412; *C.K. ex rel A.K. v. Baltimore City Bd. of Commissioners,* Civ. No. GLR-22-804, 2023 WL 3740555, at *7 (D. Md. May 31, 2023); *S.F. v. Smith,* Civ. No. 19-2207-PWG, 2022 WL 3082980, at *7–8 (D. Md. Aug. 3, 2022).

not required to offer a detailed explanation of his or her credibility assessments.'" (quoting *S.A.*, 898 F. Supp. 2d at 877)). Thus, there is no reason to believe that the ALJ's evaluation of the evidence of R.S.'s performance at McLean during her seventh and eighth grade years was not appropriate and adequate.

> 4. *The ALJ's credibility determinations are supported by MCPS's witnesses "cogent and responsive" explanations.*

Plaintiffs' final argument in support of their assertion that the ALJ's decision should not be awarded deference is that "the ALJ inexplicably relied upon" the opinions of MCPS school officials "as to the appropriateness of the proposed IEPs and placements and overlooked the[ir] failure to provide the required cogent and responsive explanation" of the proposed services in the IEP. ECF 19-1, at 28–29. According to Plaintiffs, "the school system uniformly failed to apply its expertise to R.S.'s education and failed to provide a cogent and responsive explanation for its proposed programs." *Id.*

It is true that the ALJ did not explicitly state that Defendants had provided a "cogent and responsive" explanation of the IEPs they developed for R.S., but the ALJ was not required to use this exact language in assessing whether R.S. had been provided a FAPE. The ALJ did, however, find that Defendants "developed an IEP that was reasonably calculated to meet the unique needs of the Student" for each of the relevant school years. Decision, at 58. The decision further explained that "in developing the [2020–2021] IEP, the school-based members of the IEP team gave thoughtful consideration to the Student's strengths and weaknesses, the concerns of the Parents, Dr. Rao's [relevant] evaluation, and the academic, developmental and functional needs of the Student." *Id.* at 58–59. The ALJ explained that all of these considerations were "set[] forth in great detail" in the IEP. *Id.* at 59. The ALJ provided a similar explanation relating to the 2021–2022 and 2022–2023 IEPs, writing that "the IEP team thoroughly considered the Student's

strengths and weaknesses, the Parents' concerns, recent evaluations and assessments, and the academic, developmental[] and functional needs of the Student" and that those IEPs again provided "a detailed account of all those considerations." *Id.* at 64. This analysis indicates that the ALJ was satisfied that Defendants had provided "cogent and responsive" explanations of the IEPs.

Furthermore, the Court is satisfied that Defendants' educators provided "cogent and responsive" explanations of the IEPs in their testimony before the ALJ. The transcript of the hearing is ripe with "cogent and reasoned" explanations from the educators as to why they made the specific decisions underlying the IEPs. *See* Transcript, at 709 (describing the goal of the "combinations and supports" in R.S.'s IEP and explaining what it means for R.S. to "access[] the curriculum"); *id.* at 748 (describing why teacher recommended co-taught classes for R.S.); *id.* at 859–60 (describing how to implement specific accommodations from the IEP and how they aid R.S.); *id.* at 1045–46 (explaining why R.S. would benefit from being in general education classes with services and supports, as provided for in her IEP, as opposed to being in separate, small group classes all day). That each individual educator could not provide an explanation for each individual component of the IEPs does not mean that Defendants failed as a whole to provide a "cogent and responsive" explanation. *See* ECF 19-1, at 30–31; *see also A.H.*, 367 F. Supp. 3d at 413–14 (finding that educators had provided "cogent and responsive" explanations for IEPs when each individual provided explained portions of the IEP based on their own expertise and observations). When the testimony from the hearing is taken as a whole, Defendants explained their rationale and logically explained their reasons for the contents of each IEP, providing a "cogent and responsive explanation." There is no reason to doubt that the ALJ followed "a normal fact-finding procedure" and appropriately assessed the credibility of the witnesses. *See A.H.*, 367 F. Supp. 3d at 414.

As such, the ALJ's decision is entitled to "due weight," and the factual findings of the ALJ are considered to be prima facie correct. *A.H.*, 367 F. Supp. 3d at 411. Because Plaintiffs have failed to discredit the ALJ's factual findings, the Court accepts those factual findings and credibility determinations.

**B.      Defendants provided a FAPE for R.S. for the 2020–2021, 2021–2022, and 2022–2023 school years, and Plaintiffs are not entitled to reimbursement for the expense of enrolling R.S. at McLean.**

Having determined that the ALJ's decision is entitled to "due weight" and that the ALJ's factual findings are entitled to deference, the Court must now consider whether Plaintiffs have met their burden to show, by a preponderance of the evidence, that Defendants failed to offer R.S. a FAPE during the relevant school years. Plaintiffs fail to meet this burden.

Under the IDEA, Defendants were required to offer R.S. a FAPE for each of the school years in question. 20 U.S.C. § 1400(d). The Supreme Court provided insight into what exactly a FAPE requires in *Endrew F.* 580 U.S. at 399. "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* The Court also clarified that a FAPE need not be an "ideal" education; it must only be "*reasonable.*" *Id.* (emphasis in original). The aim is to "enable the child to make progress." *Id.* And while passing grades are not an automatic indication that a child is receiving a FAPE, "[w]hen a child is fully integrated in the regular classroom, as the [IDEA] prefers, what that typically means is providing a level of instruction reasonably calculated to permit advancement through the general curriculum." *Id.* at 402, 402 n.2.

Additionally, "[t]he IDEA requires participating states to educate children with disabilities in the [least restrictive environment]—that is, alongside children who are not disabled '[t]o the maximum extent appropriate.'" *R.F.*, 919 F.3d at 246 (quoting 20 U.S.C. § 1412(a)(5)). Generally, children with disabilities are to be removed from the "the regular educational

environment . . . only when the nature or severity of the disability of a child is such that education in regular classes [with appropriate supports] cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)); *see also R.F.*, 919 F.3d at 246 (quoting the same).

Defendants offered R.S. an IEP reasonably designed to provide her with a FAPE based on her individual needs for her seventh, eighth, and ninth grade years. The school-based members of the IEP team considered all of the data available to them about R.S.'s progress both at MCPS and at McLean and used that information to develop IEPs each year that were responsive to her needs.[11] Decision, at 19 ¶ 64, 35 ¶ 115, 43 ¶ 149. The IEPs were designed to allow R.S. to make progress. *See Endrew F.*, 580 U.S. at 399. R.S. was making reasonable progress at MCPS before the pandemic, earning mostly As and Bs in her courses, several of which were advanced courses. Decision, at 8 ¶ 21, 12–13 ¶¶ 44–45. Even if R.S. was also making progress at McLean—and even if she was making *greater* progress at McLean—the IDEA only requires that the IEP offer her a *reasonable* education, not an ideal one. *Endrew F.*, 580 U.S. at 399. As the IDEA requires, R.S.'s IEPs integrated her into the general education framework at MCPS as much as possible, and in such a situation, passing grades are a key indicator that a student is receiving a FAPE. *Id.* at 402.

Furthermore, as explained above, the educators who developed R.S.'s IEPs have provided cogent and responsive explanations of development of the IEPs, and the courts are not to "substitute their own notions of sound educational policy for those of the school authorities which

---

[11] That R.S.'s IEPs were continuously tailored to her needs is further indicated by the fact that the IEPs "became longer and longer as the years went by," as Defendants strived to continually add and adjust services to better accommodate R.S. Decision, at 64. IEPs must be evaluated based on the information available at the time and not judged in hindsight. *Z. B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018). And, as explained above, that the 2022–2023 IEP included additional services as compared to the 2021–2022 IEP does not indicate that the 2021–2022 IEP was inadequate. Instead, it reflects that the IEP team was striving to continually improve R.S.'s educational services. *T.S.*, 2010 WL 2431021, at *12; *see also Schaffer*, 554 F.3d at 477.

they review." *Rowley*, 458 U.S. at 206. Though R.S. may still have had struggles under the proposed IEPs, the preponderance of the evidence supports that Defendants did offer her a FAPE for each of the school years in question. And because Defendants provided R.S. with a FAPE, Plaintiffs are not entitled to reimbursement for R.S.'s tuition at McLean, regardless of whether the education she received there was proper. *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993) (explaining that providing a student with a FAPE "is [the] IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims"). Plaintiffs have failed to meet their burden, and Defendants are entitled to judgment on the record.

## IV.   **CONCLUSION**

T.S. and B.S. clearly want to give their daughter access to the best education possible, which is undeniably an admirable goal. However, while the state must provide a disabled child with a free appropriate public education that is reasonably calculated to ensure that child makes progress, the education provided need not be ideal, and it need not meet every preference expressed by the student or the parents. *Endrew F.* 580 U.S. at 399. Because Defendants here offered R.S. an IEP that would provide her with a FAPE for each school year in question, Defendants are entitled to judgment on the record with respect to all claims.

For the foregoing reasons, Plaintiffs' motion for judgment on the record, ECF 19, is **DENIED**, and Defendants'' motion for judgment on the record, ECF 20, is **GRANTED**.

A separate implementing Order will issue.

Dated: <u>July 18, 2024</u>

/s/
Brendan A. Hurson
United States District Judge
